**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

---

**JOHN DOE,**

        *Plaintiff*,

    **v.**                       **Case No.** 3:25-cv-357 (MAD/ML)

**CORNELL UNIVERSITY,**

        *Defendant*.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his complaint against Defendant Cornell University ("Cornell" or the "University"), respectfully alleges as follows:

### NATURE OF THE ACTION

1.    This action arises out of an egregious miscarriage of justice against Plaintiff, a male undergraduate student in his final semester at Cornell University, when Cornell conducted a flawed and biased Title IX sexual misconduct process, carried out under the presumption of guilt in an attempt to find Plaintiff responsible as a male accused.

2.    Complainant Jane Roe[2] (hereinafter "Complainant" or "Roe") falsely accused Plaintiff of sexual assault following a consensual encounter between Plaintiff and Roe that occurred in December of 2023.

---

[1] Plaintiff has filed a motion herewith to proceed by pseudonym.
[2] Jane Roe is a pseudonym. Plaintiff will refer to Roe and the other student witnesses involved in this matter via pseudonym.

3.      Roe's allegations were so outlandish that the police declined to pursue charges against Plaintiff. As a result, Roe proceeded to file a formal complaint with Cornell's Title IX office in which she embellished and further falsified her claims against Plaintiff, in an attempt to have Plaintiff found responsible.

4.      Roe's claims were so clearly false that following a Title IX hearing which included eight hours of live testimony, Plaintiff was found not responsible in a detailed 25-page decision.

5.      Roe, however, appealed the finding and embellished her claims even further to claim for the first time that she affirmatively told Plaintiff "no" during the encounter.

6.      Incredibly, the Appeal Panel took Roe's statements at face value and overturned the Hearing Panel's decision in a conclusory four-page document, despite having no clear evidence that the decision of the Hearing Panel was clearly erroneous, as required by Cornell's policies.

7.      Worse, while the University gave Roe an opportunity to appeal the initial decision, the University failed to allow Plaintiff an opportunity to appeal the decision of the Appeal Panel, despite that being the first time he was found responsible. Instead, the University subjected Plaintiff to a one semester suspension effective immediately and had him escorted off campus by police.

8.      By employing gender-biased, pre-determined presumptions of Plaintiff's guilt from the outset, and by imposing an unreasonable sanction, Defendant displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

9.      By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition at Cornell.

2

10.    Defendant engaged in a biased, flawed, and deficient investigation and disciplinary process, which rendered a finding and sanction that were arbitrary, capricious, unreasonable, fundamentally unfair, and not supported by sufficient evidence.

11.    As a result of Defendant's discriminatory and unlawful conduct, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished/lost future educational and career prospects.

12.    Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

13.    Plaintiff is a natural person and resident of New York. During the events described herein, Plaintiff was enrolled as a full-time, tuition-paying, undergraduate student at Cornell University.

14.    Defendant Cornell University is a partially federally funded private university located in Ithaca, New York, where it maintains its principal offices and place of business.

## JURISDICTION AND VENUE

15.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

16.    This Court has personal jurisdiction over Defendant Cornell on the grounds that it is conducting business within the State of New York.

17.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.    **BACKGROUND**

A.  **Plaintiff's Background**

18.    Plaintiff has worked extremely hard for over 12 years to achieve high grades, has engaged in countless hours of volunteer work, years of meaningful research, and years of leadership involving multiple extra-curricular endeavors, with the goal of pursuing a future career in medicine.

19.    After witnessing an extensive degree of illness within his family, including multiple cancers and neurological disease within his mother, uncle, grandmothers and aunts, Plaintiff has dedicated his studies and future career to making a difference in the world, especially with the state of medicine and healthcare being in jeopardy.

20.    Plaintiff matriculated to Cornell in the fall of 2021, with an expected graduation date of May 2025. Plaintiff has maintained a 4.0 GPA at Cornell while majoring in biology and has earned the highest grade in two of his Genetics classes. Plaintiff also scored in the top 5 % of the country on his pre-medical MCAT scores. Plaintiff's goal is to help many generations as a dedicated, compassionate physician.

B.  **The Alleged Incident**

21.    Plaintiff and Jane Roe are both undergraduate students at Cornell and first met by way of mutual friends in 2023.

22.    Plaintiff and Jane Roe maintained a casual, acquaintance relationship and socialized in group settings, but had never interacted one on one prior to the events described herein.

23.     Based on their friendly group interactions, Plaintiff invited Roe to his fraternity's formal event, and Roe accepted the invitation.

24.     On December 5, 2023, the night of the formal, Roe attended a "pregame" at Plaintiff's apartment, along with friends C, K, and A.

25.     Plaintiff and Roe both consumed alcohol at the pregame, but were not intoxicated.

26.     At the formal, Plaintiff and Roe consumed alcohol, danced, and interacted with friends.

27.     At approximately midnight, Plaintiff and Roe kissed while on the dance floor.

28.     However, Plaintiff then felt uncomfortable with the public display of affection and pulled away from Roe.

29.     Later in the night on December 5, after the formal ended, Plaintiff and Roe returned back to Plaintiff's apartment in an Uber.

30.     Plaintiff and Roe remained in Plaintiff's living room for a few minutes, where they talked with C and his girlfriend.

31.     Plaintiff then asked Roe once if she wanted to go to Plaintiff's room, and Roe said yes.

32.     Upon entering Plaintiff's room, Plaintiff and Roe began consensually kissing.

33.     Roe then stated, "I just want to cuddle," so Plaintiff and Roe laid together and cuddled.

34.     A few minutes later, Roe began touching Plaintiff's body and kissing him again.

35.     Roe then began to take her clothes off, and Plaintiff assisted her.

36.      Plaintiff then asked Roe if she wanted to use a condom, and Roe affirmatively said yes.

37.     Plaintiff and Roe then engaged in sexual intercourse, in which Roe was an active and willing participant.

38.     Afterwards, Plaintiff and Roe fell asleep for a few hours.

39.     When Plaintiff woke up around 1:00 a.m., Roe was lying on his arm.

40.     Plaintiff then decided he should get Roe home, so he gave Roe his coat and walked her back to her apartment.

41.     Plaintiff and Roe talked in a friendly manner the whole way back to Roe's apartment.

42.     Roe never gave any indication that she took issue with her interactions with Plaintiff.

### C.    Roe's Report to the CUPD

43.     On December 6, 2023, Roe went to the Cornell University Police Department ("CUPD") to falsely report that Plaintiff had sexually assaulted her the night prior.

44.     That same day, the CUPD reported the alleged incident to Cornell's Office of Institutional Equity and Title IX (the "Title IX Office").

45.     On December 19, 2023, Roe met with Cornell's Title IX Office, where she again claimed that Plaintiff had sexually assaulted her on the night of December 6, 2023.

46.     Despite the severity of her claims, Roe stated that she did not want to pursue a formal Title IX complaint against Plaintiff.

47.     In the spring of 2024, the police decided that they would not pursue charges against Plaintiff due to insufficient evidence.

**D. <u>Roe's Formal Title IX Complaint and Investigation</u>**

48.    Clearly dissatisfied by the decision of CUPD to not pursue charges, Roe subsequently met with Cornell's Title IX Office again on April 23, 2024, nearly four months after the initial meeting, and requested to file a formal complaint.

49.    However, Roe did not sign the formal complaint until nearly one month later, on May 21, 2024.

50.    To Plaintiff's complete shock, he received a written Notice of Allegations on May 24, 2024, which charged him with sexual assault.

51.    While Plaintiff's statements throughout the investigation remained consistent—that Roe gave affirmative consent to all sexual activity on the night of December 5, 2023 into December 6, 2023—Roe's version of events changed drastically throughout the investigation, seriously calling her credibility into question.

52.    Indeed, Roe made many statements about the alleged incident which evolved and escalated over time to make Plaintiff's conduct seem more severe. Roe's statements include: (i) her first statement to the police on December 6, 2023; (ii) her phone interview with police on December 15, 2023; (iii) her signed voluntary statement to police on January 26, 2024; and (iv) her interview with the Cornell investigator on May 10, 2024. By way of example, and not limitation:

   a.    Roe first stated (in two of her statements) that when her friend wanted to leave, Roe voluntarily decided to stay at the formal to have fun. Five months later, however, Roe claimed she did *not* want to stay at the formal and was not *able* to leave;

   b.    Roe initially stated that Plaintiff pushed her against the wall, and that she only made out with Plaintiff because she thought it would be awkward to reject him. Five months later, Roe claimed that she kept trying to "turn away" and "push [Plaintiff] off." Roe never mentioned trying to push Plaintiff off of her in her previous three statements;

c. Roe initially stated that Plaintiff never told her she could not leave and that she thought Plaintiff would not have stopped her if she did try to leave. Five months later, in a different statement, Roe never mentioned her ability to leave;

d. Roe also never mentioned in her final statement that she spent time with Plaintiff talking, socializing, and dancing that night, although she mentions this in her initial statements;

e. In Roe's second statement, she stated that she sat on the bed next to Plaintiff when they went into Plaintiff's room. In Roe's third statement, she stated that Plaintiff's jacket was on the chair and so she sat on the edge of the chair. In her last statement, Roe claimed that she said she was sitting in the chair, and that Plaintiff asked her to come sit next to him;

f. In Roe's second and third statement, she said she and Plaintiff were kissing on the bed and she was "putting up with it." Later in the investigation, Roe claimed that Plaintiff pushed her down on the bed and that she pushed Plaintiff off;

g. In Roe's second statement, she said that she touched Plaintiff's genitals to help Plaintiff get erect. In Roe's third statement, she said she used her hand on Plaintiff's genitals briefly. However, in Roe's statements to Cornell's investigator, she never mentioned touching Plaintiff's genitals;

h. In Roe's first statement, she said she stayed at Plaintiff's apartment until it was light out. In Roe's second and third statements, she said that after sex she "considered staying and sleeping a little." In Roe's later statements, she said right after she had sex she thought "oh, this means I can go home now," and then Plaintiff asked if she wanted to go home and she said yes; and

i. Roe claimed that she and Plaintiff never interacted one on one before the night in question. However, Roe and Plaintiff have a photo together taken well before the night of the alleged incident, where she is leaning on Plaintiff's shoulder with her arm wrapped around Plaintiff. Additionally, Roe's roommate testified that one week before the formal, Roe was "forward" with Plaintiff and had her legs on Plaintiff at a house party.

53.    Roe's discrepancies throughout the investigation seriously call into question the reliability of Roe's statements and suggest that she embellished her narrative over time.

54.    On information and belief, Roe was angered when her first few statements to the police were not enough to continue a police investigation, and in response Roe exaggerated her narrative in the Title IX investigation.

55.    The investigation continued from May through October 2024.

56.    A hearing was subsequently held for Roe's complaint against Plaintiff, on November 19 and December 6, 2024.

### E.    The Hearing Decision

57.    Following the hearing, on January 6, 2025, the Hearing Panel issued a detailed 25-page decision which found Plaintiff *not* responsible for sexual assault (the "Hearing Decision").

58.    The Hearing Decision found that there was insufficient evidence to determine by a preponderance of the evidence that Plaintiff engaged in sexual activity with Roe without her affirmative consent. The Hearing Decision stated, in pertinent part:

> Specifically, there was insufficient evidence, based on the complainant's statements, to find there was not a knowing, voluntary, and mutual decision among the parties to engage in sexual activity. Understanding that the complainant's silence did not demonstrate consent, the Panel found that the respondent could reasonably believe that he had clear permission to penetrate the complainant's vulva with his penis under these circumstances. It was undisputed that no verbal "yes" or "no" was exchanged by either party, however, the complainant told him "absolutely not" when he asked if he could remove the condom. Moreover, the parties' actions, including the respondent undressing the complainant, putting on a condom, and penetrating her without the complainant verbalizing an objection, along with no indications of resistance, struggle, or the use of physical force, tended to diminish the likelihood that the respondent intentionally disregard any signals from the complainant she did not wish to engage in this activity.

> The Panel noted that the parties did communicate at some junctures during intercourse, including when the parties initially escalated physical contact but stopped when the complainant asked to cuddle, along with when the respondent asked if he could remove the condom, and she responded to him by saying no. These moments suggested they were engaged in ongoing communication during the incident. All of these facts led the Panel to conclude that there was insufficient evidence to find it was more likely than not that the respondent penetrated the complainant's vulva with his penis without the complainant's affirmative consent.

59.     The Hearing Decision then noted, in accordance with Cornell's Title IX Policy: "Either party may appeal a decision of the Hearing Panel to a three-member Appeal Panel."

### F.  **The Appeal Decision**

60.     Given that he was found *not* responsible, Plaintiff did not appeal the decision.

61.     Roe did, however, appeal the Hearing Decision, claiming that she did not give affirmative consent, and, to the contrary, that she actually told Plaintiff "no."

62.     Significantly, this was the first time throughout the investigation that Roe unequivocally claimed that she told Plaintiff "no," which was in line with Roe's pattern of embellishing her story as the investigation proceeded.

63.     On March 14, 2025, the Appeal Panel despite being in "total agreement with the Hearing Panel's findings regarding credibility and what more likely than not occurred in respondent's bedroom," overturned the Hearing Decision to find Plaintiff responsible for sexual assault.

64.     Instead of performing an objective analysis of the Hearing Decision, the Appeal Panel took Roe's statements at face value and explained away Roe's own inconsistent statements.

65.     Indeed, the Appeal Panel heavily relied on Roe's request to cuddle, claiming that this was Roe's attempt to "deescalate" the situation.

66.     The Appeal Panel also focused on Roe's statement that she told Plaintiff that he could not take off the condom *during* intercourse (which he respected), while completely disregarding that Roe told Plaintiff to use a condom *before* intercourse, thereby demonstrating a willingness to participate in the activity.

67.    Not only did the Appeal Panel overturn the decision and wrongfully find Plaintiff responsible for sexual assault, but the Appeal Decision also sanctioned Plaintiff to a one semester suspension, effective immediately.

68.    Plaintiff was then immediately escorted off campus by police.

69.    While Roe was given an opportunity to appeal the Hearing Decision finding Plaintiff not responsible, Plaintiff was not given the same opportunity to appeal the decision of the Appeal Panel finding him responsible.

70.    Instead, the Appeal Panel issued an *immediate, non-appealable* sanction.

### G. The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.

71.    On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

72.    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

73.    The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

74.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

75.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 31.

76.     In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. *Id*. at 25-31.

77.     In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

78.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct.

79.    Colleges and universities, including Cornell, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like Cornell, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

**H. The 2017 Revocation of the DCL.**

80.    On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

81.    In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*."  Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017),    https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

**I. The 2020 Title IX Final Rule.**

82.    On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020.  ("US Department of

Education        Releases        Final        Title        IX        Rule," available        at

https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

83.    The 2020 Title IX Final Rule replaced all previously issued OCR guidance,

including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

84.    The 2020 Title IX Final Rule provides respondents with procedural rights which

the Plaintiff was deprived of during his own disciplinary proceeding, including the right to appeal

a determination that sex-based harassment occurred. (*See* "Summary of Major Provisions of the

Department        of        Education's        Title        IX        Final        Rule," available        at

https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).[3]

85.    In light of the 2020 Title IX Final Rule, Cornell updated its Title IX Policy as of

August 2020.

## II.    AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT CORNELL UNIVERSITY

86.    Upon Plaintiff's matriculation to Cornell, Plaintiff and Cornell became mutually

bound by Cornell University's Policy 6.4 "Prohibited Bias, Discrimination, Harassment, and

Sexual and Related Misconduct" (the "Policy") as well as the Procedures for Resolution of Reports

Against Students Under Cornell University Policy 6.4 for the Following Acts of Prohibited

Conduct (the "Procedures") (collectively the "Policies").

87.    The Policies constitute and represent a contract between students and the

University, and in particular, between Plaintiff and Cornell.

---

[3] In April of 2024, the Biden Administration issued a new set of Final Title IX Regulations, requiring compliance by August 1, 2024. However, on January 9, 2025, the Eastern District of Kentucky in *Tennessee v. Cardona*, 2025 WL 63795 (E.D. Ky. Jan. 9, 2025), ruled the 2024 Title IX Regulations were unconstitutional and ordered vacatur of the rules nationwide. Thus, the 2020 Title IX Regulations remain in effect.

88.     Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Procedures and permitting gender bias to infect and taint the proceedings.

89.     The Procedures define "Affirmative Consent" as: "a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity."

90.     Cornell breached the Procedures by failing to properly apply the definition of Affirmative Consent. The Appeal Panel completely disregarded Roe's actions, which unequivocally indicated affirmative consent, and found Plaintiff responsible because he did not obtain explicit *verbal* consent.

91.     The Policy states: "This policy furthers the university's commitment to creating a learning, living, and working environment free of bias, discrimination, harassment, and sexual and related misconduct, and to meeting applicable legal requirements. Such applicable legal requirements include, but are not limited to… the New York State Education Law Article 129-B (NYS 129-B)."

92.     New York State Education Law Article 129-B states that students have the right of "[a]ccess to at least one level of appeal of a determination."

93.     Cornell breached the Policy by failing to afford Plaintiff at least one level of appeal when he was found responsible for sexual assault. Instead, Plaintiff was sanctioned to immediate removal from camps and a one semester suspension.

94.     The Procedures state that, on appeal, "Findings of fact will not be set aside unless clearly erroneous."

95.     Cornell breached the procedures because the Appeal Decision failed to demonstrate that the Hearing Decision was clearly erroneous. The Appeal Decision only cited *disagreements* with the Hearing Decision, but failed to demonstrate evidence sufficient to state that the finding was clearly erroneous.

### III.    PLAINTIFF'S DAMAGES

96.     As a direct and proximate result of Defendant's biased, unlawful, negligent and improper conduct, Plaintiff was wrongly found responsible for engaging in sexual assault, and such a finding has been made part of Plaintiff's educational records.

97.     These notations of responsibility forever mar Plaintiff's records, especially in the wake of the powerful #MeToo movement, characterizing him as a sexual predator.

98.     Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future.

99.     Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault.

100.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, which, on information and belief, will be forever noted on Plaintiff's transcript.

101.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damage to his future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**Erroneous Outcome**

102.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

103.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

104.    Cornell University, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

105.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Cornell.

106.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

107.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

108.    "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715.

109.    Cornell violated Title IX in the instant case because the University reached an erroneous finding that Plaintiff was responsible for sexual assault, and gender bias was a motivating factor in the wrongful finding.

110.    Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above. Specifically, Roe made many statements about the alleged incident which evolved and escalated over time to make Plaintiff's conduct seem more severe. Roe's statements include: (i) her first statement to the police on December 6, 2023; (ii) her phone interview with police on December 15, 2023; (iii) her signed voluntary statement to police on January 26, 2024; and (iv) her interview with the Cornell investigator on May 10, 2024. By way of example, and not limitation:

    a.    Roe first stated (in two of her statements) that when her friend wanted to leave, Roe voluntarily decided to stay at the formal to have fun. Five months later, however, Roe claimed she did *not* want to stay at the formal and was not *able* to leave;

    b.    Roe initially stated that Plaintiff pushed her against the wall, and that she only made out with Plaintiff because she thought it would be awkward to reject him. Five months later, Roe claimed that she kept trying to "turn away" and "push [Plaintiff] off." Roe never mentioned trying to push Plaintiff off of her in her previous three statements;

    c.    Roe initially stated that Plaintiff never told her she could not leave and that she thought Plaintiff would not have stopped her if she did try to leave. Five months later, in a different statement, Roe never mentioned her ability to leave;

    d.    Roe also never mentioned in her final statement that she spent time with Plaintiff talking, socializing, and dancing that night, although she mentions this in her initial statements;

    e.    In Roe's second statement, she stated that she sat on the bed next to Plaintiff when they went into Plaintiff's room. In Roe's third statement, she stated that Plaintiff's jacket was on the chair and so she sat on the edge of the bed. In her last statement, Roe claimed that she said she was sitting in the chair, and that Plaintiff asked her to come sit next to him;

    f.   In Roe's second and third statement, she said she and Plaintiff were kissing on the bed and she was "putting up with it." Later in the investigation, Roe claimed that Plaintiff pushed her down on the bed and that she pushed Plaintiff off;

    g.   In Roe's second statement, she said that she touched Plaintiff's genitals to help Plaintiff get erect. In Roe's third statement, she said she used her hand on Plaintiff's genitals briefly. However, in Roe's statements to Cornell's investigator, she never mentioned touching Plaintiff's genitals;

    h.   In Roe's first statement, she said she stayed at Plaintiff's apartment until it was light out. In Roe's second and third statements, she said that after sex she "considered staying and sleeping a little." In Roe's later statements, she said right after she had sex she thought "oh, this means I can go home now," and then Plaintiff asked if she wanted to go home and she said yes; and

    i.   Roe claimed that she and Plaintiff never interacted one on one before the night in question. However, Roe and Plaintiff have a photo together taken well before the night of the alleged incident, where she is leaning on Plaintiff's shoulder with her arm wrapped around Plaintiff. Additionally, Roe's roommate testified that one week before the formal, Roe was "forward" with Plaintiff and had her legs on Plaintiff at a house party.

111.    The significant discrepancies in Roe's statements, which embellished and exaggerated her claims over time, raise considerable doubt about the accuracy of the Appeal Board's decision.

112.    There was a particularized causal connection between the erroneous outcome in this case and gender bias. Facts sufficient to plead the existence of this bias and its connection to the erroneous outcome have already been alleged in the Complaint in detail and include, without limitation, the following:

    a.   From the start, the investigation and appeal was slanted in favor of Roe. Roe's story was deemed credible from the beginning and given more weight in the Appeal Decision in what occurred that night. In that regard, Defendant took Roe's statements at face value, and put the burden on Plaintiff to disprove the allegations;

    b.   Cornell pursued Roe and encouraged her to file a formal complaint against Plaintiff, even after she declined to file a formal complaint, demonstrating a presumption of Plaintiff's guilt from the outset;

    c.   The Appeal Decision was not supported by a preponderance of the evidence;

    d.  The Appeal Panel failed to adequately assess Roe's credibility, and refused to acknowledge discrepancies in her story;

    e.  The Appeal Panel took Roe's statements at face value, despite Roe's shifting and contradictory statements;

    f.  The Appeal Panel failed to give adequate discretion to the Hearing Decision;

    g.  Cornell failed to allow Plaintiff access to at least one level of appeal, despite the Appeal Decision being the first time that Plaintiff was found responsible;

    h.  The federal pressure placed on Cornell by virtue of threatened OCR investigations, which put Cornell at risk for losing federal funding;

    i.  Upon information and belief, Cornell's administration and leadership exercised pressure, ideological and otherwise, to find males responsible for accusations of sexual misconduct, even where the evidence suggested otherwise;

    j.  Cornell's Title IX office relentlessly pressed Roe to file a complaint against Plaintiff, the male accused, despite Roe stating that she did not want to file a formal complaint; and

    k.  Cornell provided Roe, the female complainant, an opportunity to appeal a decision which was not in her favor, but did not provide the same opportunity to Plaintiff, the male accused.

113.    Cornell's mishandling of Plaintiff's case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

114.    Indeed, the Department of Education's threat of rescinding federal funds is no longer solely a threat.

115.    On March 7, 2025, one week before the Appeal Panel issued its decision, the Department of Education announced the immediate cancelation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the

face of persistent harassment of Jewish students.[4] Shortly thereafter, on March 19, 2025, the Department of Education suspended $175 million in funding to the University of Pennsylvania due to its policies surrounding transgender student athletes.[5]

116.    Cornell applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous outcome.

117.    Cornell also imposed an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor, for the same reasons as described above.

118.    Upon information and belief, Cornell has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

119.    Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and to punish him severely for it.

120.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

121.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Cornell to: (i) reverse the outcome, findings, and sanction

---

[4]        https://www.ed.gov/about/news/press-release/doj-hhs-ed-and-gsa-announce-initial-cancelation-of-grants-and-contracts-columbia-university-worth-400-million

[5]        https://www.nytimes.com/2025/03/19/us/politics/trump-to-pause-175-million-for-university-of-pennsylvania-over-transgender-policy.html

regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

### AS AND FOR A SECOND CAUSE OF ACTION
**Breach of Contract**

122.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

123.    At all times relevant hereto, a contractual relationship existed between Cornell and Plaintiff by virtue of Plaintiff's enrollment at Cornell and as defined by and through Cornell's Policies and procedures governing the student disciplinary system.

124.    Through the documents it publishes and provides to students, Cornell makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of its Policies.

125.    Implied in every contract is the covenant of good faith and fair dealing.

126.    Based on the aforementioned facts and circumstances, Cornell created express and implied contracts when it offered, and Plaintiff accepted, admission to Cornell, and when Plaintiff paid the required tuition and fees.

127.    As detailed above, Cornell breached its agreement(s) with Plaintiff throughout the course of its investigation and adjudication of Jane Roe's complaint. By way of example, and not limitation, Defendant Cornell University:

     a.    Demonstrated bias in favor of the Complainant when the Appeal Panel overturned the Hearing Decision without adequately demonstrating that the Hearing Decision was clearly erroneous;

b. Failed to adequately apply the definition of "affirmative consent" when overturning the Hearing Decision; and

c. Failed to afford Plaintiff at least one level of appeal after he was found responsible for the first time.

128. Cornell further breached the implied covenant of good faith and fair dealing, by applying its policies in a discriminatory manner.

129. As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

130. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Violation of New York State Human Rights Law**

131. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

132. Defendant Cornell is an educational corporation and operating as such under the laws of the State of New York.

133. The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

134. Cornell's Policy states:

This policy furthers the university's commitment to creating a learning, living, and working environment free of bias,

discrimination, harassment, and sexual and related misconduct, and to meeting applicable legal requirements. Such applicable legal requirements include, but are not limited to… Title IX of the Education Amendments of 1972 (Title IX) including the 2020 amendments to the Title IX regulations (34 CFR Part 106)… the New York State Education Law Article 129-B (NYS 129-B), the New York State Human Rights Law, New York City Administrative Code § 8-101 et seq.

135. Based on the foregoing, Cornell permitted discrimination against John Doe on the basis of his sex.

136. Based on the foregoing, Cornell authorized, condoned, and/or acquiesced to discriminatory conduct against John Doe.

137. Based on the foregoing, Cornell knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

138. Defendant Cornell engaged in the following discriminatory acts or practices against John Doe, as the male accused: Cornell subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his gender; Cornell failed to adhere to its Handbook; and the Appeal Decision was discriminatory in that, given the evidence (or lack thereof), the only possible way to reach the Appeal Decision was a discriminatory bias against males.

139. Based on the foregoing facts and circumstances, Cornell engaged in unlawful, discriminatory practices in violation of N.Y. Exec. Law § 296(4).

140. As a direct and proximate consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

141.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendant Cornell University as follows:

(i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972 (erroneous outcome), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Cornell to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    On the third cause of action for violation of New York State Human Rights Law § 296(4), a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

(iv)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff John Doe herein demands a trial by jury of all triable issues in the present matter.


Dated:    New York, New York
          March 21, 2025

                                         Respectfully submitted,

                                         NESENOFF & MILTENBERG, LLP
                                         *Attorneys for Plaintiff John Doe*

                                   By: /s/ *Tara J. Davis*
                                             Andrew T. Miltenberg, Esq.
                                           Stuart Bernstein, Esq.
                                           Tara Davis, Esq.
                                           Kristen Mohr, Esq.
                                           363 Seventh Avenue, Fifth Floor
                                           New York, New York 10001
                                           (212) 736-4500
                                           amiltenberg@nmllplaw.com
                                           sbernstein@nmllplaw.com
                                           tdavis@nmllplaw.com
                                           kmohr@nmllplaw.com